We're ready for the first case. It's Consolidation Coal Company v. Georgia Power. Mr. Darra? Is it Darra? Darra. Good morning. May it please the Court. My name is Dan Darra. I represent Appellant and Plaintiff Consolidation Coal Company in this case. Maybe real quickly before we get into the details of the case, a little comment about what transformers do that might be helpful. Transformers are used, as I'm sure you know, to change the voltage in an electric current, either stepping it down or stepping it up. The essential component of a transformer is what's called the core and the coil. The core is composed of iron sheets that are bound together. The question is whether the coils are a primary coil and a secondary coil for the incoming voltage. Whether it was junk or whether it was useful, I take it. I'm sorry, Your Honor? This is all going to the issue of whether this was junk or whether it was useful. Yes, Your Honor. But in order to get to that issue, I think to understand that the guts of the transformer are the core and coil. If the core and coil are damaged... It sounds like what you were giving me is what I just read in your brief. That's what I was trying to figure out where we're going with this. Just why don't you move on to your legal argument. Right. Okay. As also indicated in the brief, the appellants here and two other parties have spent now $78 million cleaning up approximately 450,000 tons. Why don't you go to your legal argument? Okay. Our argument is on this appeal that Georgia Power's sale of its broken and obsolete transformers did include an arrangement for disposal of a hazardous substance that would subject it to liability. The key words... What about the Savannah electric ones? As I understand the record, they were all working. They were obsolete. And in order to be... What difference does that make? Well, in order to be useful for anybody, they had to be completely rebuilt. They couldn't be used on anybody's system as they were because their voltages were not configured properly. In order to change those voltages, they had to be taken... They've taken those transformers to wherever you wanted to go, plugged them in, turned them on, and they would have worked. They might not have given you what you wanted, but they would have worked. That's a fair statement. So, what difference does it make if the ultimate customer needed to reorient the voltage in a transformer? The ultimate customer... Well, whether you're talking about a broken transformer or an obsolete transformer, in order to be usable, it has to be reclaimed. It has to be remade. It goes right to the point, the first factor in NUMO-ABEX, about whether a material is reused entirely or whether it has to be reclaimed before it can be reused. I'm trying to drill down to the principles here. Sometimes we have to use hypotheticals to do that. Let's say, with the Savannah electric ones, they all worked. And in theory, some other power company in Pakistan could have used them right away. Wait a minute. But the purchaser of them sent 10 there, but decided they could make more money if they kept 10 here and redid the coils and sold them to somebody else. What difference does that make? Under that scenario, I don't think it makes a difference. I do think it makes a difference if... So the answer then is, if as they were sold, they're usable anywhere in the world as they are, then you lose? That's what your answer was. Yes. But usable as transformers as is, not remade to be transformers to be used. As I look at the Supreme Court cases on this, the element of intent that has been added by the Supreme Court into it is that you must indicate there was an intent on the part of Georgia Power at the time that it sold these transformers to essentially dispose of the PCB, this residual PCB, because as I understand, for the most part, they drained it out. Right. Do you read it that way? I read the Supreme Court Burlington Northern as saying that in order for there to be liability, the transaction has to include or the sellers has to include an intent, not necessarily the intent, to discard those PCBs. Is that to be inferred, or is it to be something that you have to bring forth to actually show they intended that result? I think the court indicated, particularly by citing to this cellophoil case, that it could be determined from looking at circumstantial evidence. It's not something where you have to have the seller admit, yes, I intended to get rid of the PCBs by doing this. Putting it in the context of these transactions, at the time these transactions occurred, there were limitations on what Georgia Power could do with transformers, depending upon what the PCB concentration was in those transformers. They, in 1974, adopted a written policy defining how they were going to dispose, their work, not mine, dispose of their obsolete and broken transformers. In 1978, they changed that policy or amended that policy to say, as part of looking at how we're going to dispose of those transformers, we're going to test the PCB concentration, and that will tell us what we can do. The severity of the contamination, it seems to me, when Congress changed that statute and added spillage and leakage in it, that a very small part, small amount of that PCB can do a lot of damage. Absolutely. Is that pretty much? Absolutely. Are we talking drops? Yes. Yes. The site that we've cleaned up, 450,000 tons of contaminated dirt. It's a lot of contaminated dirt. There wasn't a big dumping of oil on that site. It was drips and spills resulting from the process of opening up the transformer, pulling out the corn coil, which is soaked in oil. That drips. People walk on it. They drive high lifts over it. They take that out into the backyard. The soil gets contaminated a little bit here, a little bit there over time. It's not a massive spill. Let's say I've got a farm tractor, and I decide I want to get another. So I'm going to sell this. It's got hydraulic oil in it. It's regular oil. It's diesel. And obviously, I don't want to clean that tractor out. All that's in there, because I'll have trouble selling it, and I'd have to dispose of it. So I'm going to sell it. It might be used for farming, lumber business, construction, but it's got hazardous substances in it. I'll sell the tractor. Am I an arranger? Well, you may be an arranger, but you're not subject to liability because you probably qualify for the consumer product and consumer use exemption. That's not consumer. I'm using it in business. You're using the product. You're using it in your business. What if he has a business, and he's used five or six, and he sells one under the same scenario? In such that he wouldn't qualify for the consumer product exemption. You sold it for reuse. I'm selling it to you because I want to use it on your farm. Okay. Am I an arranger? No, because I'm entirely reusing the tractor as you sold it to me. Well, but you're going to have to redo the hydraulics on it, so you're going to have to drain the hydraulic oil out of it. I know that. I sell it. That affects the price. Okay. Then you could be an arranger if there was hazardous substance in the hydraulic oil, and I don't know that there is because there typically is not. What if you drained the oil out of the tractor before it's given to them, knowing that there may be some residual part in it? Would that make you an arranger? I'd answer the question this way. One of the purposes of the environmental laws, including SERPA, is to hold people responsible for the hazardous substances that they use and profit from their use, and to say that it's your responsibility when the use is no longer there, that it's been used up. What's the answer to his question? The answer to the question is that I think if there's residual contamination in there and your way of getting rid of that residual contamination is to sell it to somebody else, that you're an arranger. Some of these transformers, the oil was drained from? Some were not? Yes, but none were empty of oil. They all had some at least residual oil in it. To make it usable, a transformer that has had oil drained from it, you simply just put oil back in it? No. What do you do? You open it up and you take out the guts. You replace the coils because the insulation in the coils are saturated with the oil. The oil that's in them is like molasses. It's not like water. It just doesn't run out and dry up. And so that insulation is saturated and impregnated with PCBs. The inside of the casing, the tank, is coated with that oil. Board employees, as part of rebuilding and repairing these things, climbed inside those things with rags that used a solvent. If these transformers were being sold new, the person who sold them wouldn't be liable for any of this? No, they would not. What if a person sells it knowing that the oil or the PCBs have to be changed every 100,000 hours or something like that? Don't they present the exact same concerns you have? I don't think that if you sell something that's brand new that will last or expected to last. No, no, you sell it knowing. There's no question. You know those PCBs have to be at some point in their life, they have to be replaced. An oil change in a car. Are you an arranger then? I don't think so. Then why is that any different than the hypothetical that Judge Ashen gave? I think it's the timing in terms of if I'm selling it because now is the time that I have to get rid of those PCBs. Judge Ashen's hypothetical. He didn't wait until the last minute of life of the hydraulic oil because he knows he's going to have to, you know, take a hit in the price. So he does it halfway through the life because that suits his business schedule. Does that change the scenario in your mind as to who's responsible as compared to a seller of a new product? I think that if part of his purpose of entering into the transaction includes an intent to dispose of a hazardous substance. He wants to dispose of the tractor. He also wants to dispose of your hypothetical. No, no, his. He just wants to sell the tractor. He doesn't have any intent. The only intent he has is that the tractor has hydraulic fuel in it. I project your hypothetical. That he has the hydraulic fuel in it. He wants to sell the tractor. Right. See, he's in more trouble than a seller of a new tractor knowing that at some point the person they sell the tractor to, in this instance Judge Agee, will have to change the hydraulic fluid. In my view, yes. He's in more trouble than the seller of a brand new tractor. Thank you very much. Thank you. But the real issue in that case would be whether the intent was to dispose of PCB. The selling of the tractor, the selling of the transformers, nothing wrong with doing that. From the Supreme Court's northern case, essentially what you have to establish is there's an intent to dispose of PCBs and to know there's residual PCB from your perspective, I would think. It would be if Georgia Power sells a transformer knowing there's PCB in it, whether it's residual from having drained it or from oil itself, then the question is, is this something that has to be redone? And in redoing it, will there be spillage? Will there be leakage? Will there be that whole array of things that Congress talked about in the later enactment? I would agree with that except I would modify it that I have to show that the intent included the intent to get rid of those PCBs, not that the sole intent was to get rid of those PCBs. Yes. Thank you. Thank you, Mr. Darrow. Mr. Ginsberg. Good morning, Your Honors. Good morning. May it please the Court, Mike Ginsberg for PCS Phosphate. I want to be clear about one thing in particular. Seventeen of the transformers that Georgia Power sold to Ward were full of oil. One of them had 520 gallons of PCB oil containing 488 parts per million of PCBs. Would that make them an arranger if they were fully operational and would immediately be put back to use without any change whatsoever? If they were, if they could, if that were the facts of the case, it would not make them an arranger if they could be reused as they were. The fact is that these transformers... Being full of oil helps you from the perspective of showing that at least one of the purposes that is included in this would be the fact that Georgia Power wanted them to dispose, wanted to dispose of this PCB. Right. If it's a fully functional transformer with the oil in it, whether you send it to Pakistan or you send it down to Research Triangle Park, it doesn't matter if it is operational. It doesn't make them an arranger, does it? If the transformer was operational, I think Mr. Darragh just agreed with that, it's not an arrangement for the disposal. But, in fact, these transformers were not operational. That's what the facts in the underlying case, in the record show, is that, in fact, these transformers were faulty. They were obsolete. They were scrap. Well, there's a difference between faulty and obsolete. There is. There was, Georgia Power had a whole practice and a whole procedure for getting its useless transformers. These were transformers that they had pulled off the lines, either because they were faulty. Well, they were useless to them, but not necessarily useless to other people. I would have heard nobody would have bought them. Well, let's say 100, we'll just round it off, sell 100 transformers. And the purchaser of the transformers has a market in, pick your country, Pakistan, Afghanistan. They send 50 over there because they can use them right away because of the state of their electrical systems. But the other 50 they can't. They have to be redone. So, when Georgia Power sells them, they don't know what they're going to do with the transformers. Under that fact scenario, are they an arranger in whole or in part? They're certainly an arranger in part because 50 of those transformers are faulty. In other words, these transformers are coming off the line. They've been hit by electricity. They failed. And in order to make them usable, they have to be rebuilt. What if the seller thought, mistakenly, but thought they were all usable somewhere as they were somewhere, then they wouldn't be responsible for anything they thought was usable as is, correct, under your theory? If the facts were to show, Your Honor. That's what I said, if. I understand. I would agree with you in that scenario, if they thought that all of the transformers were usable. As to each transformer they thought was reusable in some way as it was, then they're not an arranger as to that transformer. Because they could be reused in the words of – What's the answer to that? The answer is yes. Because they could be reused in the words of the new Moebeck's decision, they could be reused as is. They didn't have to be reclaimed and reused. Your answer is yes. But if that was just one thing, they thought they could be reused, but they also had the purpose, if they also had the additional fact, the purpose and the intent to dispose of PCBs, would that make them an arranger under that scenario? Well, if you add that to the facts, that their intent was to rid themselves of PCB transformers without concern about whether they could be reused or not. The fact you're trying to establish here is that it's not about selling this equipment, it's the fact that there's intent on the part of Georgia Power to dispose of this PCB. They know they've got to get rid of this thing. So they drain it out, they know there's some residual in it, and they sell a transformer to a repair shop, so to speak, or a middle person who's then going to resell it. And I just heard your co-counsel say if this thing is drained, it's got to be broken down. Now, I don't know if that's going to be held up on the other side or not, but that's what he said. That's exactly true. It's got to be broken down. There's that spillage and that leakage that can happen, and did happen in this case. Once you cut the transformer open, then you've got to rebuild it. And these transformers had to be rebuilt. I mean, the facts of the case are that Georgia Power was a sophisticated user of transformers. I mean, they're an electrical power utility company. They knew as much about transformers as anybody and that they were ridding themselves of these obsolete transformers, which had PCBs in them. If they could use it. Under that scenario, isn't any seller of used equipment anywhere going to be an arranger? Because even though the main motivation is to sell equipment, get what return they can, you can almost assume that every piece of industrial, farm, construction, landscape equipment has some sort of a hazardous substance in it, and certainly no seller of it is going to want to keep the hazardous substance when they sell equipment. So what seller of used equipment is not an arranger? A seller of used equipment that can be used in the condition in which it's sold is not an arranger. But what if part of the reason, what if there was a memo, they said these are still usable, let's sell them quick, or they still have a year left on them because God knows we don't want to deal with the PCBs at the end of the year. Are they then an arranger? I think they are. I think they are. It doesn't turn on usability then, in your mind. It goes back to intent. It goes back to intent. And then this court has said in Neumo AVEX that... So why wouldn't that apply to any person selling some used item? Could you not reasonably infer that at least, as your co-counsel said, A, he said an intent, not the intent he stressed two or three times. So if there's any intent at all to do away with the problem of PCBs, no matter what else, every used sale would become an arranger, wouldn't it? It's going to depend on the... I agree with you. It's going to depend on... I'm sorry. Take the facts as I gave them to you. It's not hypothetical. I'm not arguing with the facts. What I'm saying is it depends. There's another fact we need to know, which is what is the sophistication of the person who's making the arrangement, who's making the sale? Sophisticated enough to know they're going to have a problem on their hands. Exactly. And if that's the case and they're doing it in order to arrange, Burlington Northern says, if a purpose of the transaction is to arrange for the disposal... Doesn't that give absolute perverse incentives to trying to be efficient and salvage and reuse everything? Doesn't that lead to you might as well go ahead and throw away everything you have, no matter if it has any useful life? You better go and buy something new because you're going to have other liabilities if you sell it all. I don't think so. I think the answer is that it's better to make sure that when you dispose of something or sell something that's got hazardous substance in it that you have to make sure that the person you're selling it to can manage those hazards. You'd have to do it either way, though. You'd have to do it if you sold it yourself. I mean, if you did it yourself or you sold it to somebody else. So if you get something, if you buy something that has an environmental, potential environmental concern, you're not getting off the hook. You're not getting off the hook. And isn't that the right answer? No, that's not the right answer. The answer that you ought to be looking for is what was the intent of Congress in passing CERCLA. This is a material where a drop or two can cause tremendous damage. It's a very harsh statute. There's no question about it. And the courts have interpreted it differently over time. But the bottom line is if you have an intent to get rid of PCB coupled with the fact you know that the person you're selling to is going to break it down and it can get into the soil, then maybe that's where you ought to be going with this argument rather than trying to give your personal opinion as to whether this is a bad thing or not. I think Congress said if you're going to sell a product that has a hazardous substance in it, you need to make sure the person to whom you're selling it is going to manage it properly. So if you dispose of it, Your Honor, the way you suggested, and you dispose of it in an improper way to somebody who's not a certified landfill and doesn't have all the precautions, you're going to have liability there, too. Thank you. You've reserved time. I did. Thank you. Thank you very much. Mr. Reinhart. Thank you, Your Honor. May it please the Court, Dan Reinhart, my partner, Jamie Terrio for Georgia Power Company. We do know, Judge Wynn, that not one drop of oil that they're talking about came from Georgia Power Company's transformers because there's no evidence in the record that Georgia Power Company's transformers were leaking, which gets to the main point, and that is the intent of Georgia Power Company. It is not enough. Is that necessary? No, it's not. Because what you're dealing with here is Duke Power and all these other power companies that's pooled together, and as I understand, I mean, this is being done. The intent here is to make sure that taxpayers don't have to pay for this massive cleanup in the business of trying to get rid of this PCB. And so the question of whether they have to actually show that your transformers leaked oil, is that relevant?  You called it scrap, did you? Oh, we probably called it any number of things. You would call a transformer scrap, call it junk, and yet you say it's usable. Absolutely. And we know from the testimony. And if it's drained of oil, which I understand some were, right? Yes, Your Honor. Is that usable? Well, it can be, yes. But to make it usable, do you have to break it down and do things to it, or can you just put some oil in it and crank it up? I believe you can just put oil in it. Is that the answer? It depends on the transformer, Your Honor. Look, the issue... It depends on Georgia Power. I'm trying to understand their intent in selling these transformers to this award company, this transformer repair type place. If it's like the tractor, all you got to do is just pour some oil in it and it keeps going, that's one thing. But if these coils have this really thick stuff on it, and you know there's PCB in there, so I'm not sure you can just put oil in it once you take it out without cleaning it or doing something. Let me ask you that. Do you have to clean it once it has been drained? And when you reuse it, can you just put oil on top of what's in there, or must you go in and get rid of that PCB in there? Well, I believe it depends on whether the transformer is operable if you just put oil in. It depends, transformer to transformer. But the issue, Your Honor... I'm going to turn it loose in a second, but I do want to know that answer because I think that's important because if all you got to do, if you're allowed, once it's been drained, is just pour more oil in on top of something that's already contaminated with PCB, then that's one thing. But if it's pretty clear you got to break that down and redo those coils, that's a different answer. Respectfully, Your Honor, I don't think that's the question. I think the question goes... Well, that's his question. It is, it is. And my question is not trying to get into the question of whether the oil is drained or not. It is the intent, as the Supreme Court said in the Northern case of Georgia Southern. In terms of selling these. That's right. Well, the issue is, did Georgia Power intend to dispose? And does that have to be the sole intent? Well, there can be mixed motives, but there has to be evidence to support it. If it is an intent. No. No. No. If their primary purpose is to sell an operable piece of equipment, but they also intend to get rid of PCB, that's not enough. Well, no. Look, anytime you sell anything, you intend to get rid of it. So the answer to my question is, no, that's not enough. That's exactly right. No, that's not enough. And one of the reasons you know that that is not enough is that you have to look to the legitimacy of the sale here. I mean, that determines whether there is a mixed motive. If you look at the General Electric case, for example, where they sold hazardous substances to one individual and they sold it on an idiosyncratic basis and sometimes they got paid and sometimes they didn't, that indicates mixed motive. Here, we have a situation where you have an active used transformer market. Ward is in the used transformer business. You can't be in the used transformer business without used transformers. Georgia Power had surplus used transformers. Ward needed and wanted them. And Georgia Power sold them on a competitive basis.  Sometimes Ward didn't. You wouldn't have a problem if there was no PCB in them. And I think after some point in time, they stopped putting this PCB in them. So you don't have a problem with those. The ones with the PCB, we have the problem with. Correct, Your Honor. But you have to have the intent to dispose of it. And when you look at a competitive bid process, the legitimacy of the sale, if you look at these cases, look, Pneumo ABEX, this court's decision. If you were going to redo ball bearings, you had slag, which was loaded with hazardous metals. If you look at the Seventh Circuit just recently, when you sell broke in the NCR case to a mill recycler, that paper company absolutely, categorically, unequivocally knows that when it sells to a recycler, the broke gets broken into two parts, one reusable for paper, the other PCB contaminated. And it's going to have to be disposed. The issue is this. If you look at Pneumo ABEX, if you look at the Seventh Circuit, what you see is that the responsibility for disposal in the case of a legitimate sale lies with the processor. It lies with the ball bearing people who make new ball bearings. It lies with the paper recycler. It does not lie with the seller. Let me give you three scenarios. Okay. First is Georgia Power has a transformer. And by the way, if I remember the record correctly, of these 101, maybe 87 or 88 of them, still under Georgia Power's guidelines had much more usable life left in them. That's correct. All right. Now, scenario number one, Georgia Power takes transformers that they say everybody agrees they're used, but they have usable life and they sell those. I'm going to ask in each instance if Georgia Power is an arranger under your theory. The third is Georgia Power has these transformers and they know they are not workable, cannot be made workable, and then they sell them. And the middle, which is more like this, they sell equipment which to go on the secondary market have to be refurbished in some way. I take that they know that because otherwise maybe they would just sell them. Now, when are they an arranger and when are they not an arranger in those three scenarios? They are not an arranger in any of those scenarios. Not even the last one where they know good and well they're no good and they have PCBs and they don't want to deal with it? No. The answer to your question is they are not an arranger. Here is why your hypothetical, respectfully, should also assume the legitimacy of the sale. Well, I don't know why it does. You assumed it. I didn't. I didn't put it in there. I thought it was a better inference that when they sell the stuff that's complete junk, everybody seems to know there's a PCB problem. They know it then. Are they an arranger in that scenario? No. The third one? No. Are they ever an arranger in your mind? Yes. But it can't be in that third one because you sold transformers that were in fact faulty. Some of them were faulty, weren't they? Yes. Some were not operable. Is that right? Yes. So you've got to say what you say. No. No, that's not my method. No, I don't because… My hypothetical is they are not workable and you know they cannot be made workable under any circumstance. Okay. They're in essence scrap. Right. That is the Chavone case. And that's the term you used, scrap, wasn't it? I'm sure we did. Yeah, you did. It says right on the record. You call these things scrap. Well, there's also evidence in the record, Your Honor, that scrap doesn't mean scrap. I'm just treating what Judge Agee just said. If they are scrap, that's what you said they were, right? Yes. You just argued that the terminology you used, scrap, that means something to you but it doesn't mean it to everybody in the world. It doesn't mean what Judge Agee just said. Scrap, in essence, is scrap. Here's real scrap, just like what Judge Agee said. Pure scrap. Pure scrap. Right. In the Chavone case, which is cited in our brief, transformers were sold as scrap. They were sold to a scrap dealer, not to a refurbisher like Ward. They were sold for scrap. The scrap had value. The metal had value. The copper had value. The court determined because of the market, because of the competitive bid, the way it was sold, it was not an arranger. The issue has to do with Georgia Power's intent, and I respectfully suggest that the active market for the transformers dictates its intent. Would you advise Georgia Power, anytime they want to sell something that has a potential PCB problem, to absolutely put memos in the file saying we're selling this for the sole purpose of recovering some scrap prices? We don't know and don't care about anything else in the world, and if we did, we'd do it differently. But for us, it's just the scrap metal market, period. In your scenario then, that would always protect Georgia Pacific, wouldn't it? Georgia Power? I mean Georgia Power. Would it always protect them? Again, no, I don't think so. Only if the memo reflected reality, and the reality has to be a competitive market. So, for example, I mean, there are cases where a seller… You mean, so if somebody's willing to buy it, then that eliminates the intent? No, because we know from the General Electric case, there was some guy willing to buy it. So it can't be a competitive market then? Right, it has to be competitive, it has to be real, and here, it isn't as if there isn't a recognized used transformer market in the United States. I mean, it exists. Well, if we differentiate two of the scenarios, the reusable transformer market from what we now call the pure scrap market, am I remembering the record correctly that none of these hundred transformers fit in the pure scrap? My understanding is that Ward sold all of them for more than they paid, or they were able to sell parts out of them. So Ward was in the business, this is their business, and they can't be in this business without purchasing used transformers, and they purchased them. And what they would do is they would put them in their yard, and they would wait. And then if Judge Shedd called up and said, I need a transformer… Don't get me into that disposal problem. I need a transformer for a hospital, and they'd say, well, what voltage do you think? And they'd go, and if they had one that worked, they'd sell it right then and there. Some they sold just, they'd flip. Others, they'd go ahead and they'd reconfigure. So if you look at pneumoavex, the seller wasn't responsible for the way the foundry dealt with slag. If you look at the Seventh Circuit, NCR isn't responsible for how the… Is there any evidence, I'm asking you, is there any evidence in this record of the intent of Georgia Power as it relates to disposing of PCBs? I mean explicit. None. Talk about what could be inferred from the sale. None, except this, except this. Georgia Power Company did testify, and this was unrebutted, that they did not intend to dispose of PCBs, and the reason is they had a separate track to dispose of PCBs. So there are different levels of PCB contaminated. If you're over 500… So there's your argument that if there is to be any intent on the part of Georgia Power, this is your argument, I think, that the sale was at least in part to dispose of PCBs, you say that would have to be inferred from the act of sale itself. I think that's right. I'm not saying you agree that it should be, but I'm saying your argument is that's the only way in this case it can be. That's right, and so that's why I've put so much emphasis, and I think the case has put emphasis on the bona fides of the sale. Look, there are cases, and the cello foil case, USBGE, Wilson Road, Summit Equipment, in all of these cases, somebody, the seller, got something back. Here, there are no discounts, no credits, no giveaways, no side deals, no below market deals, no different price if we have oil in, no different price if we have oil out, no different price if it's broken, no different price if it comes with parts or it doesn't come with parts. It's a bona fide bid, competitive bid sale. How does this situation contrast with Pneumo AVEX in your mind? You've talked about it already. How does this scenario contrast with that? Well, I think this scenario is even stronger. Why so? Well, we had a competitive bid. There's no evidence in the record that Pneumo AVEX was competitive, but we have the same scenarios. The foundry is responsible for how it processed the ball bearings and what resulted from that and how they disposed of it. But when you look at the first factor, Pneumo AVEX, essentially the court said that the wheel bearings could be used in their entirety. I mean, there seems to be evidence here. These transformers had to be broken down. Parts had to be replaced on at least some of them in order for them to be used. So that factor cannot be entirely applicable to this case. You mentioned the Seventh Circuit case continually, but this is before trial. Didn't that happen after trial? The Seventh Circuit did, yes, Your Honor. So, I mean, that's the whole difference. The only thing that would happen here doesn't mean you wouldn't win your case. Well. It's just meaning that you don't get to win it before trial as a Seventh Circuit case. It actually goes to trial. There are facts made. Maybe you disagree. Maybe you don't disagree, but it goes to trial. And that's the case you cite is the Seventh Circuit case. No, I understand that. Well, you brought it up several times in relation to the Pneumo AVEX case and turning for standing for the same proposition. And so I think it is relevant to say you're talking about a case that actually went to trial and that was the end result of it as opposed to a case where we are now in a pretrial state. Well, I think the court raised two issues. Let me address the notion of the fact that this was on summary judgment. My friends also agreed that all the evidence in the record was undisputed. In fact, they filed a cross motion for summary judgment. Now, I understand the court has a de novo review. But my point is simply this. On the issues, the direct evidence of Georgia power and its intent, and on the evidence of two tracks, one for disposal, one for sale, of disposal contracts being in the record, of the legitimacy of the sale, the court had all the undisputed evidence that it needed, and there were no genuine issues of material fact. Is that a legitimate determination? You look at it objectively to determine if the sale was being done legitimately or does it, as it seems that you're indicating, does not matter what Georgia Tech's motive or what its intent to do this. If there's an objective basis for determining that the sale is legitimate, in your view, is that okay? If I understand your question correctly. I'll say it again so you can understand it. Because I think I'm just trying to understand where you're going with this. That is, it seems to me you're saying look at the objective factors here. In other words, forget about the subtentive intent. Forget about the fact that Georgia Tech may, in fact, be wanting to do something different. Look at the objective factors here. And if that's your basis, what is the case that says that? Well, no, no. What I'm saying is there is no undisputed evidence with respect to the legitimacy of the sale. They agreed. Remember when I said. You mean there's no disputed evidence. That's what I meant, Your Honor. There is no dispute. You do mean that. That would have changed the thing a little bit. Yes. Thank you. So there was no dispute about the evidence at all. You think evidence of subjective intent on the part of Georgia Power would be relevant, don't you? Well, look, Georgia Power. You have to answer that question. Yes, you have to answer my question. Well, there's always. The answer is no, no. The answer is no. No, because. I thought you were going to say. I thought you had already indicated earlier, though, that you had evidence in the record that showed your subjective intent was not to dispose of the PCPs. Okay. I'm getting subjective and objective a little confused. It's not confusing. You just said it's not subjective. You now need to backtrack that answer a little bit if you want to continue this. Let me do that, Your Honor. No. What I'm suggesting is that in every instance, a seller subjectively wants to get rid of its inventory. So the answer to that extent, the answer is yes. You're stumbling all over yourself. I think the answer is obvious. I think it is. Isn't it true that the subjective intent of the seller is relevant? Yes or no? Yes. Yes. Yes or no? And so, but you could still have summary judgment if there's no evidence of any subjective intent to dispose. That is correct. So you could address the question of subjective judgment. That could be taken into account under the objective factor of whether there's any evidence from which a contrary conclusion could be reached. Isn't that correct? Yes. You like that argument better than the one you just made, don't you? Yes, I do. I don't know. By the way, it's not an argument. It's an answer. I just want to get this straight. You like that answer better than the answer you gave. Let me just say this because I'm going to judge the rest of your argument and your analysis by this. And I think Judge Agee pointed out to you that you've already said subjective intent does matter. On the question of summary judgment, can there be evidence of subjective intent? Yes. All right. Thank you very much. Mr. Ginsburg, glad to hear from you. What's your best evidence in the record that Georgia Power intended to dispose of PCBs other than the fact that just the sale of the transformer? Yeah. So the evidence in the record is that, number one, Georgia Power had an entire process for disposing of used transformers which were contaminated with PCBs. And they knew because they tested all their transformers. They knew what PCB levels were. So they had a whole process. It was a two-track process. So they had a track of disposing of transformers that had a lot of PCB contamination by sending them to a hazardous waste disposal facility. And they had a separate process for transformers that had lesser contamination because they thought, hey, we can make a little bit of money by selling these transformers to a recycler or a scrap dealer. Because the federal laws governing PBs did not require lower-level PCB-contaminated transformers to go to a hazardous waste disposal facility, they were able to sell them on the secondary market. It was part of the same disposal process. How does that prove of an intent to dispose of the PCBs for the transformers they sold in the secondary market? Because they knew that the transformers had PCB contamination in them. They knew they could not be reused as transformers without removing the guts that had the PCB contamination in them. They're a sophisticated user of transformers and of PCB transformers for very, very many years. To distinguish your tractor owner, for instance, the tractor owner is not a sophisticated user. Maybe a sophisticated user of the tractor, but take that person and now have that person in the business of gathering lots of used tractors and as a business of selling used tractors. That person now reached the level where they have intent and they have knowledge enough of the contamination resulting from their disposal. But in your scenario, any time a person is sophisticated, they know there are PCBs involved, correct? They know there are PCBs involved. And so if they sell a used transformer, even if it's usable for another short period of time, they know that at some point those PCBs have to be dealt with, correct? I think that's exactly right. So you think any time you sell a used item that has a PCB, you are an arranger under any and all circumstances? Yes, if you have not made arrangements to make sure that it's being sold to a purchaser who is able to manage the PCBs. In other words, there would be no liability if the person to whom Georgia Power sold the transformers managed them properly and didn't spill PCBs. And that takes me to Mr. Reinhart's legitimacy. So when you go to the auction market and there are 50 buyers out there and you sell to the highest bidder, and perchance 49 of the bidders turned out to be responsible and this 50th one did not, and that's who made the highest bid, you're under a duty to investigate all 50 of the bidders before you can sell at auction? You're certainly under a duty to make sure that the bidder to whom you sold it is a legitimate bidder. And that's why when Mr. Reinhart... When the legitimate bidder came in, he had enough money to buy the product. Well, think of what happens if that's the case. The legitimacy of sales, what Mr. Reinhart kept saying, if there's a competitive market... What's the answer to that? The answer to his question is yes, you have a duty, if you want to avoid circular liability, to make sure that you dispose of your material properly, and that means selling it or transferring it to someone who's going to dispose of it properly. Is it an objective analysis of what's going on here in terms of the transaction, or is it the subjective intent of the so-called arranger here that controls it? I think it's certainly a subjective analysis is appropriate. But I think... So if you have the intent to dispose of PCBs and you do so under these kind of circumstances, in your view, does that then have any relevance to the materiality here? I think there's both subjective and objective evidence sufficient to hold Georgia Power liable in this case. You think you can have a summary judgment over subjective intent questions, don't you? I do. And I think that there's enough evidence in the record that... No, no, no, I understand that would be your position. But you don't think the fact that subjective intent is a factor precludes summary judgment, do you? I absolutely agree with you. I think in this case it's clear... What's your best evidence of subjective intent other than the actual sale? The split process? No, that Georgia Power had an entire process for managing PCBs. There's a whole program and knowledge and sophistication. They're selling hundreds of these things, thousands of these things, and they know that the PCBs are a problem and they're subject to all the regulations. Thank you very much. Thank you. We'll step down Greek Council and go directly to the next case.
judges: Dennis W. Shedd, G. Steven Agee, James A. Wynn, Jr.